**ODINOT v. HOECKER.**

No. 12165.

Court of Civil Appeals of Texas. Galveston.

Feb. 2, 1950.

Rehearing Denied May 23, 1950.

Armstrong, Barker, Bedford & Lambdin and Owen D. Barker, Galveston, for appellant.

Henry W. Flagg, Galveston, for appellee.

GRAVES, Justice.

This appeal is from a judgment of the 56th District Court of Galveston County, sitting without a jury, dated September 1 of 1949, awarding the appellee a $3,189.69 judgment against the appellant for the breach of the latter's warranty, covering the sale and installment by him of an air-conditioning unit in the appellee's store, under a written contract between them, dated February 13, 1947.

An *in haec verba* copy of such contract is hereto attached as Exhibit A, and made a part hereof.

The decree carried a further provision, giving the appellant the right to remove the air-conditioning unit he had installed upon the appellee's premises pursuant to such contract, provided he did so not later than November 1 of 1949.

The court filed findings-of-fact and conclusions-of-law in support of its decree, the provisions of which, deemed most material to the controlling questions presented here for decision, being, in substance, these:

"(b) The air-conditioning unit in question was sold by Odinot to Hoecker and installed in Hoecker's store about the month of May, 1946, under a verbal agreement as to cost, time of payment, capacity, performance, etc. The verbal agreement was later, on, to-wit, the 13th day of February, 1947, merged into a written agreement, * * *.

"(c) The agreed cost of said unit was $2285.10, plus certain installation expenses,

which amounted to $904.59, making a total cost to Hoecker of $3189.69. Hoecker paid Odinot for the unit on April 1, 1947.

II. "(a) I interpret and construe said written agreement as representing and guaranteeing said unit to be of sufficient size and capacity to maintain at all times throughout the store space of the store known as 'McBride's Specialty Shop,' including the office space located above said store, a temperature as low as 76° F.

"(b) * * * as further representing and guaranteeing that said unit would be equipped with an automatic thermostat-control, that could be so set and regulated as to maintain a temperature inside said store of as much as 10° lower than the outside temperature, provided, of course, that said outside temperature was 86° or higher.

"(c) It is my construction of said agreement that the stipulation with reference to an inside low of 76° and the one with reference to the thermostat control are separate and distinct warranties and should not be construed as conflicting with or destroying one another; in other words, I construe the agreement as warranting that said unit could be regulated so as to maintain a temperature of as low as 76° inside the store regardless of how high the temperature went on the outside and that said unit would be equipped with an automatic thermostat control that could be set so as to maintain an inside temperature of 10° lower than the outside temperature, provided, of course, the outside temperature was 86° or higher.

"(d) I further construe said agreement to bind and obligate Odinot as follows: That in the event said unit be found insufficient in size and capacity to maintain at all times a temperature of as low as 76° inside the store space, including the office, he would remove said unit from the Hoecker store and furnish and install a larger unit (of the kind specified below) of sufficient capacity to produce and maintain at all times a temperature within said store building, including the office, of as low as 76° and that the only charge that would be made to Hoecker for the removal of said unit and the installation of the larger unit would be the difference in the actual cost of the units.

"(e) The unit which was sold to Hoecker and installed in his store in the month of May, 1946, and which was referred to in the written agreement of February 13, 1947, was what is known to the trade as a 3-ton-capacity, air-cooled unit from Odinot the parties were situated as follows:

"Hoecker, in contemplation of air-conditioning his store, had purchased in Houston an air-conditioning unit or system which required in its installation and operation a water-cooling tower. Hoecker had purchased this unit without first having ascertained whether he could obtain permission from his landlord to erect the water-cooling tower on the roof of the building in which his store was located. After acquiring such unit he found that he could not obtain permission to erect the water-cooling tower on the roof of said building. This necessitated Hoecker's disposing of said unit and determining whether he could obtain an air-cooled system (with capacity sufficient to meet his needs). This situation brought Hoecker into contact with Odinot.

"(b) At this time the defendant Odinot was engaged in the City of Galveston in the business of selling and installing in buildings air-conditioning units and machinery, and held himself out to the public, and particularly to the plaintiff Hoecker, as an expert on air-conditioning.

"(c) In May, 1946, and at the present time, there were and are only two types of air-conditioning units or machines manufactured. One type is known as the 'water-cooled type,' which required either a water tower or running water in its operation; the other type is known as 'air-cooled,' which type does not require running water in its operation.

"(d) Upon learning that Hoecker desired to air-condition his store, but that he could not obtain permission from his landlord to install a type of machine requiring a water tower or connections for running water, Odinot interested Hoecker in the purchase of the 3-ton-capacity, air-

cooled unit, the subject of this suit, which Odinot had in stock at the time, and, as above stated, represented and guaranteed to Hoecker that said unit was of sufficient size and capacity to maintain at all times a temperature inside said store space, including the office, as low as 76°, and guaranteed that in the event such unit failed thus to perform and function he would take said unit out and install a larger unit sufficient to maintain such temperature with no cost to Hoecker other than the difference in the cost of said units.

IV. "(a) In the month of May, 1946, and at the present time, the largest 'air-cooled' unit or system that is manufactured is a 3-ton-capacity unit such as was sold to Hoecker and installed in his store.

"(b) At the time said unit was purchased by him, Hoecker did not know that a 3-ton-capacity unit was the largest air-cooled unit obtainable and did not know that a 3-ton, air-cooled unit was not large enough to maintain an inside temperature in his store building, including the office above, of as low as 76° at all times. However, I find that at the time said sale was made and said written agreement of February 13, 1947, was entered into, Odinot knew both these facts or that he is charged by law with the knowledge of such facts.

V. "(a) I find that the unit now installed in the Hoecker store is not of sufficient capacity to maintain an inside temperature in the McBride store of 76° during the hot summer weather and that it has no appreciable effect in cooling the office space above.

"(b) I find that the present unit is properly installed and is producing and functioning to its capacity, but that it is too small a unit to maintain the low temperature it was represented and guaranteed it would maintain.

"(c) I find that along about the month of May, 1947, when the weather began to get hot, the unit wholly failed to cool the office space or that of two small dressing rooms located within the main store space, to any appreciable extent, and failed to maintain a low of 76° in any part of the store space.

"(d) I find that from the time of its installation to the time of this trial said unit at no time, while the weather was really warm, kept or maintained a temperature of as low as 76° in any part of said store space, and that it failed to cool the two dressing rooms and also failed to cool the office space to any appreciable extent below the outside temperature.

"* * *

VII. "(a) I find as a fact that the present 3-ton capacity, air-cooled unit can not be corrected, adjusted or made to fulfill the warranties made for it, because of its inherent weakness, and that, it being the largest capacity of air-cooled unit manufactured, Odinot can not fulfill the obligation assumed in the written agreement of February 13 to replace said unit with a larger air-cooled unit.

VIII. "(a) I find that Odinot's proposal to install another unit in the window of the office and/or to install an additional 3-ton-capacity, air-cooled unit to work in connection with the present unit is not a fulfillment of the obligation assumed by him in said written agreement and that Hoecker should not be required in law or in equity to accept either of such proposals.

IX. "(a) I conclude that under the foregoing facts and under the terms of the written contract of warranty sued upon the only judgment that can properly be rendered in this cause is one in favor of Hoecker against Odinot for the cost of the unit, to-wit, $2285.10, plus the installation expenses amounting to $904.59, or a total of $3189.69, and that upon the payment of said amount by Odinot he should be entitled to remove the present unit from the Hoecker store.

"(b) I conclude that, under the terms of the written agreement sued upon, Hoecker should not be relegated to a suit for damages for the difference between the market value of the unit furnished and installed by Odinot and what would have been the market value of the machine as represented by Odinot. * * *

"(c) * * * under the terms of the written agreement, Odinot knowingly misrepresented in a very substantial way the

performance of the unit in question and knowingly obligated himself to do an impossible thing, to wit, take out the present unit and install a larger air-cooled unit. Based on such findings and conclusions of law, the trial court is of the opinion that Odinot should be required to take out the unit in question and to reimburse Hoecker for the price paid him by Hoecker for the unit, plus the installation costs."

As its judgment and findings of both sorts make plain, the court construed the contract "as representing and guaranteeing that the unit would maintain in the entire store a temperature as low as 76° F., and that it would also be equipped with an automatic thermostat control that would maintain a temperature inside the store of 10° lower than the outside temperature, provided, the outside temperature was 86° or higher; * * *".

In other words, to repeat the court's construction of, and findings as to the developed-facts under this feature of the contract, they were these: "I construe the agreement as warranting that said unit could be regulated so as to maintain a temperature of as low as 76° inside the store regardless of how high the temperature went on the outside and that said unit would be equipped with an automatic thermostat control that could be set so as to maintain an inside temperature of 10° lower than the outside temperature, provided, of course, the outside temperature was 86° or higher."

At much length, as indicated supra, the court further found on the facts not only that both the so-determined obligations under the contracts were in nowise met by the appellant, but that he further likewise failed to remove the unit, upon appellee's timely demand therefor.

The judgment in money, as well as the elements thereof, as properly flowing to the appellee from the detailed facts, as stated both in the court's judgment and its findings, were consistent in kind and amount as resulting from a contract, which had the meaning so attributed to this one.

This court, after a careful study of the record, is unable to sustain any of appellant's Points-of-Error, in which he challenges all the stated conclusions as to the meaning of the contract by the court, as well as many of its findings-of-fact, the controlling ones of which he asserts to have been "contrary to the undisputed evidence, and the great weight of the credible evidence, and the plain terms of the case-contract; * * *".

These conclusions require an affirmance of the appealed-from judgment, without the necessity of ruling upon, specifically, each and all of the appellant's assignments.

In other words, if the contract between these parties, when reduced to its ultimate in meaning, reflected the simple agreement between them the trial court so concluded it carried, there can be little, if any, doubt that the court properly applied the correct law of damages in its determination of what the appellant was obligated to the appellee for. Powers v. Sunylan Co., Tex.Com.App., 25 S.W.2d 808; Free Sewing Machine Co. v. S. T. Atkin Furniture Co., Tex.Civ.App., 71 S.W.2d 604; Nunn v. Brillhart, 111 Tex. 588, 242 S.W. 459.

It is the same as to the detailed facts concerning what occurred, what was done by both parties under the contract, and what the resulting situation between them had come down to at the time the trial court passed upon the controversy.

This court finds no lack of support in the testimony for any of the findings-of-fact so recorded by the court below, being firmly of the opinion that the testimony of the appellant himself lent support to many of the most material ones.

The authorities cited are thought to support these conclusions. The judgment will be affirmed.

Affirmed.

### Exhibit A

That, whereas Seth J. Hoecker, owner of McBrides Specialty Shop, located at 2028 Ave. E. Galveston, Texas, has purchased from me one (1) 3 ton air conditioning unit to be completely installed, and,

Whereas, there is some uncertainty regarding the efficiency of the said unit and as well the installation thereof, and therefore it is desired to reduce to writing the mutual agreement between the said Seth J. Hoecker and the undersigned, as follows:

R. G. Odinot, the undersigned, represents to the said Seth J. Hoecker that said unit is now properly installed, and should any deficiency in the operation and production of the said unit hereafter be caused or due to improper installation thereof then the said R. G. Odinot will correct any and all such errors and/or reinstall the said unit at his own cost and expense, and without cost and expense to the said Seth J. Hoecker.

The said unit is unconditionally guaranteed for the period of 90 days beginning with and on the date of its complete and proper installation, against all deficiencies and defects in capacity of production, material, and workmanship, including the manner and method of installation.

The said unit is hereby represented and guaranteed to be of such efficiency and capacity so as to retain at all times, an inside temperature in the store place and office of said McBrides Specialty Shop a minimum of 76° F., and to be controllable and controlled by thermostat so that the inside temperature of such store place and office shall be maintained at a temperature of at least 10° F. below the outside temperature; the thermometer reading of the U. S. Weather Bureau of Galveston, Texas, to be accepted as the "outside" temperature.

Should the present 3 ton unit be found insufficient in size and capacity to comply with the requirement above stipulated, then the said R. G. Odinot hereby obligates and binds himself to take out such present unit and to furnish and install a larger unit of sufficient capacity to produce and maintain the degree of temperature as provided for and agreed upon herein above, charging the said Seth J. Hoecker only the difference in the actual cost of the units, and the cost and expenses of removal of the present unit and the installation of the larger unit to be born—by and at the sole cost and expense of the said R. G. Odinot.

Executed this *13th* day of February, 1947.

(Signed)   R. G. Odinot

Witnessed:
(Signed) M. J. Kearney
(Signed) G. W. Atkins

Notation:
"Down payment
Feb. 13th, 1947
Check #5512 285.10"

On Appellant's Motion for Rehearing.

GRAVES, Justice.

Appellant's motion for rehearing refused, with qualification that this Court construes the trial court judgment as leaving the appellant the right to remove the equipment in controversy in this cause at any time within 60 days after final judgment upon paying the sum awarded against him by the trial court judgment.

Motion refused.